UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |  |
|---|---|---|
| J.L. HERREN & ASSOCIATES, P.C., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 13-1314 (LMB/IDD) |
| | ) | |
| MELISSA BRITTON, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION
## TO DISMISS COUNTS I, II, IV, AND V OF THE COMPLAINT

Charles B. Wayne (VSB # 24954)
Victoria A. Bruno (*pro hac vice*)
DLA Piper LLP (US)
500 8th Street, N.W.
Washington, D.C. 20004
(202) 799-4253
(202) 799-5253 (fax)
charles.wayne@dlapiper.com
victoria.bruno@dlapiper.com

*Counsel for Defendant*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

MATERIALS THAT MAY BE CONSIDERED ...................................................... 2

FACTUAL BACKGROUND ....................................................................................... 3

    A.   Britton's Employment by Herren ........................................................... 3

    B.   The Organization of the Navy and Its Contracting Entities ........... 4

    C.   Britton's Termination by Herren and Subsequent Work................. 6

    D.   Herren's "Retention Agreement" and Allegations of Wrongdoing ............... 7

STANDARD OF REVIEW ......................................................................................... 8

ARGUMENT ................................................................................................................. 9

I.    THE RETENTION AGREEMENT'S NON-COMPETITION AND NON-
SOLICITATION PROVISIONS ARE OVERBROAD AND THUS
UNENFORCEABLE AS  A MATTER OF LAW ............................................ 9

    A.   Non-Competition Provision (Count II) ............................................. 11

        1.   Legitimate Business Interests................................................. 11

        2.   Effect on Departed Employee's Ability to Earn a Living ................. 13

        3.   Public Policy ............................................................................. 14

    B.   Non-Solicitation Provision (Count I) ................................................ 14

II.   HERREN HAS FAILED TO ALLEGE A CLAIM FOR TORTIOUS
INTERFERENCE WITH BUSINESS RELATIONSHIP OR EXPECTANCY................. 18

III.  HERREN HAS FAILED TO ALLEGE A CLAIM UNDER THE VIRGINIA
BUSINESS CONSPIRACY ACT ...................................................................... 19

CONCLUSION.............................................................................................................. 20

i

## INTRODUCTION

Defendant Melissa Britton, a single mother of three young boys, informed her employer, a government contractor named J.L. Herren & Associates, P.C. ("Herren"), that she planned to resign and start her own business. Despite Britton's transparency about her plans, Herren fired her. Since her termination, Britton has done nothing to interfere with Herren's $3.3 million contract with an organizational unit of the United States Navy called Space and Naval Warfare Systems Command. Instead, she has done what she told Herren she was going to do: work as a full-time subcontractor on an entirely different Navy contract with a different Navy unit, Naval Supply Systems Command. Herren is not a party to that contract.

Herren has nevertheless brought suit against Britton, alleging that her work as a subcontractor under a contract unrelated to Herren somehow translates into breaches of contract, intentional torts, and conspiracy. Four of Herren's five counts in its complaint are defective and should be dismissed with prejudice under Fed. R. Civ. P. 12(b)(6). In addition to the complaint itself, the Court may consider the contract on which Counts I and II are based as well as materials of which the Court may take judicial notice.

Counts I and II, based on Herren's so-called "Retention Agreement," seek to enforce a non-competition provision and a non-solicitation provision. Both provisions fail because of their gross overbreadth. Moreover, as to the non-solicitation provision, Herren's claim rests on the entire United States Navy being a single, indivisible "client or customer." In reality, the Navy has well over 400 unique contracting entities. In addition, the agreement's provisions are directly contrary to the strong public policy in favor of promoting competition among government contractors so that the government obtains the best value at the lowest price. Both provisions are contrary to Virginia law, and the Court should declare the entire Retention Agreement to be unenforceable.

Two of Herren's three tort counts fare no better. Its claim for tortious interference with business relationship or expectancy fails for the same reason as the contract counts: the Navy is many clients, not one. Herren's contract is with an wholly different Navy Command than the contract under which Britton works as a subcontractor. That point aside, there is no allegation that Britton has interfered in any way with Herren's $3.3 million contract. Nor has Herren sufficiently pleaded concrete facts that would allow it to allege the probability of a future economic benefit from a business expectancy. Herren's expectancy claim is based on pure speculation.

Finally, Herren has failed to make out a claim under the Virginia Business Conspiracy Act, Va. Code §§ 18.2-499 to -500. This Court has held that such a claim is subject to a higher pleading standard that requires particularity. Herren has failed even to identify Britton's purported co-conspirator, much less specific acts taken in furtherance of the conspiracy.

The Court should dismiss Counts I, II, IV, and V with prejudice.

## MATERIALS THAT MAY BE CONSIDERED

When ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court "may consider the complaint itself and any documents that are attached to it." *CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009). Similarly, a court "may consider a document that the defendant attaches to its motion to dismiss if the document was integral to and explicitly relied on in the complaint and if the plaintiff[ ] do[es] not challenge its authenticity." *Id.* (citations and internal quotation marks omitted).

The Fourth Circuit has also held that "matters of which a court may take judicial notice" may be considered by a court in resolving a Rule 12(b)(6) motion to dismiss. *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)) (internal quotations marks omitted). The facts judicially

2

noticed must, under the language of Fed. R. Evid. 201(b)(2), be able to "be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *See Katyle*, 637 F.3d at 466 (taking judicial notice of published stock prices and stock analysts' reports).[1]

Among those sources are governmental websites. *E.g.*, *Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004) (taking judicial notice of statistics available on Virginia Division of Legislative Services website and affirming dismissal of complaint); *Hanks v. Wavy Broadcasting, LLC*, 2012 WL 405065, at *4 (E.D. Va. 2012) (taking judicial notice of information on Virginia State Corporation Commission website and dismissing complaint); *Wynne v. Birach*, 2009 WL 3672119, at *1 n.3 (E.D. Va. 2009) (taking judicial notice of same).

Defendant Britton requests that the Court take judicial notice of Exhibits 1-10 attached hereto.

## FACTUAL BACKGROUND

### A.  Britton's Employment by Herren

Plaintiff Herren, founded in 1989, "provides engineering and consulting services to government clients throughout the Washington D.C. metropolitan area." Compl. ¶ 1.  Herren hired defendant Britton in August 2006 as a consultant and promoted her several times before ending her employment in July 2013. *Id.* ¶ 5.

Britton's final position with Herren was as program manager for Herren's contract to provide management consulting services to the Navy Enterprise Resource Program ("Navy

---

[1]   *See also Field v. Berman*, 2013 WL 2382304, at *2 (4th Cir. 2013) (employing judicial notice in affirming motion to dismiss); *In re PEC Solutions Inc. Securities Litigation*, 418 F.3d 379, 390 & n.10 (4th Cir. 2005) (taking judicial notice of and deriving percentages from publicly-available documents filed with the SEC in affirming motion to dismiss); *Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 655 & n.4 (4th Cir. 2004) (taking judicial notice of published stock prices in affirming motion to dismiss); *Jones v. Shooshan*, 855 F. Supp. 594, 604 (E.D. Va. 2012) (Brinkema, J.) (over plaintiff's objection, court took judicial notice of series of public documents and granted motion to dismiss in part).

ERP"), a new, integrated business management software system that will replace the Navy's legacy systems. Under this contract, Britton and other Herren employees assisted the Navy ERP "Program Management Offices in managing [the Navy's] extensive software implementation." *Id.* ¶¶ 6-8. Britton and the other Herren employees performed work under the contract at the Navy ERP Program Management Office, which is located in Annapolis, Maryland. *Id.* ¶ 7.

The organizational unit of the Navy that awarded Herren this contract is the Space and Naval Warfare Systems Command, in support of the Program Executive Office – Enterprise Information Systems, Navy ERP. *See* Ex. 1.[2] Most recently, Herren was awarded a follow-on contract for the period of April 23, 2013 through January 20, 2014. The follow-on contract is in the amount of $3,288,851. *Id.*

Herren has subcontracted part of the work under its contract to Maga Design Group, Inc. Compl. ¶ 19.

**B.  The Organization of the Navy and Its Contracting Entities**

The Department of the Navy has three principal components:  (1) the executive offices, mainly in Washington, D.C. and known as "The Navy Department"; (2) the operating forces; and (3) the shore establishment.  *See* Ex. 2.  The shore establishment "provides support to the operating forces (known as "the fleet") in the form of:  facilities for the repair of machinery and electronics; communications centers; training areas and simulators; ship and aircraft repair, intelligence and meteorological support; storage areas for repair parts, fuel, and munitions; medical and dental facilities; and air bases."  Ex. 3.  The shore establishment is divided into organizational units called "Commands."  *See id.*

As stated above, the Command that awarded Herren its contract is Space and Naval

---

[2]    Ex. 1 can be found at https://e-commerce.spawar.navy.mil/ (use search term "Herren"; then follow "N00178-04-D-4062-4501" hyperlink).

Warfare Systems Command ("SPAWAR").  SPAWAR is one of the five "Systems Commands" in the shore establishment, the others being Naval Sea Systems Command, Naval Air Systems Command, Navy Facilities Engineering Command, and Naval Supply Systems Command.  *See* Ex. 3.  Each of the Systems Commands is a separate organizational entity, with its own chain of command, and each reports directly to the Assistant Secretary of the Navy for Research, Development and Acquisition.  *See* Ex. 4.  The Systems Commands are also among the 11 Navy "contracting activities" as set forth in the Defense Federal Acquisition Regulation Supplement ("DFARS"), 48 C.F.R. § 201.104 *et seq.*, which supplements the Federal Acquisition Regulation ("FAR"), *id.* § 1.101 *et seq.*  *See id.* § 202.101 (defining and listing "contracting activities" within the Department of Defense).  Each of these 11 Navy contracting activities has been delegated "contracting authority" through the Navy's "agency charter."  *Id.*

The Commander of each of the 11 Navy contracting activities (typically a Rear Admiral) serves, for procurement purposes, as the "Head of the Contracting Activity,"[3] a term defined in the FAR as "the official who has overall responsibility for managing the contracting activity." 48 C.F.R. § 2.101.  The contracting authority held by a Commander in his role as Head of the Contracting Activity is delegable,[4] and is expected to be re-delegated to the "lowest level" in the procurement system, "consistent with law."[5]  In practical terms, this authority is delegated to

---

[3] *See, e.g.*, September 17, 2003 Memorandum of Agreement Between Commander, SPAWAR and Program Executive Officer, Command Control, Communications, Computers and Intelligence and Space at 3 (attached as Ex. 5).

[4] 48 C.F.R. § 1.108(b) states:  "Each authority is delegable unless specifically stated otherwise (see § 1.102-4(b))."

[5] 48 C.F.R. § 1.102-4(b) states: "The authority to make decisions and the accountability for the decision made will be delegated to the lowest level within the [Federal Acquisition Regulations] System, consistent with law."

"contracting officers," who are the only individuals who may enter into and sign contracts on behalf of the federal government. *Id.* § 1.601(a).

As a result of this procurement framework that requires delegation of contracting authority to the lowest appropriate level, i.e., the contracting officer level, there are many organizational units within the Navy that exercise contracting authority.   These Navy organizational units, as well as most other federal entities with contracting authority, are required to enter information about each of their contracts into the Federal Procurement Data System ("FPDS"),[6] a single repository for all U.S. government-wide procurement data. *See id.* § 4.600 *et seq.* FPDS contains information about most government contracts and modifications thereto if the contract is above the "micro-purchase threshold," *id.* § 4.606(a), which is currently $3,000.

A search of FPDS for FY 2012-2013 (the last two fiscal years available) reveals 444 distinct contracting entities within the Navy for that period in that database. *See* Ex. 6.[7]  In terms of gross expenditures, the Navy's contracts totaled nearly $90 billion in FY 2010. *See* Ex. 7 at 21 (derived from FPDS data).

### C.   Britton's Termination by Herren and Subsequent Work

On July 12, 2013, Britton informed Herren's executives that (1) she had formed her own company, Mission Effect, LLC; and (2) Mission Effect would be a subcontractor for Maga Design Group, Inc. on its prime contract with Naval Supply Systems Command ("NAVSUP"), which is headquartered in Mechanicsburg, Pennsylvania.   Compl. ¶¶ 10, 16-17.   The entity

---

[6]   FPDS may be found at https://www.fpds.gov.   Certain agencies are exempt from reporting to FPDS, and certain types of contracting activity need not be reported to FPDS. *See* 48 C.F.R. § 4.606(c).

[7]   Even though some of the contracting entities on the list have the same name, they are actually distinct, as reflected by their unique code identifier (in parentheses following the entity's name). *See* Ex. 6 at 1-9. The list at pp. 1-9 of Ex. 6 is based on the data contained in the following 31 pages of the exhibit.

within NAVSUP that contracted with Maga Design is NAVSUP Weapon Systems Support ("NAVSUP WSS").  *See* Exs. 8[8] and 9.[9]  At present, NAVSUP WSS has approximately 3,400 contract solicitations and presolicitations outstanding.  *See* Ex. 10 (excerpt).[10]

After Britton told Herren's executives of her decision, they terminated her employment four days later.  Compl. ¶ 24.  Since then, she has, through Mission Effect, worked as a subcontractor on Maga Design's prime contract with NAVSUP WSS in Mechanicsburg.  *Id.* ¶ 22.

### D.  Herren's "Retention Agreement" and Allegations of Wrongdoing

Herren required that Britton execute a "Retention Agreement," which she signed in December 2012, more than six years after she was hired.  *See* Ex. 11.  This agreement serves as the basis for Counts I and II of the complaint.  The agreement contains both a non-competition provision and non-solicitation provision.  The non-competition provision (*id.* at 2) prevents the employee, during employment and for a period of one year following the end of employment, from

- "serv[ing] in any capacity, job or function (including as a proprietor, partner, officer, director, employee, consultant or agent)";

- "for any organization or entity that provides management consulting services which are competitive with those which, during his employment with [Herren], were rendered by [Herren's] Federal Sector practice serving the U.S. government"; and

---

[8]  Ex. 8 is a NAVSUP organizational chart that is available at https://www.navsup.navy.mil/navsup/ourteam (follow "Org Chart" hyperlink).

[9]  An abstract of Maga Design's contract with NAVSUP WSS can be found in FPDS.  *See* https://fpds.gov (use search term "Maga Design").

[10]  Ex. 10 can be found at https://www.fbo.gov/index?s=agency&mode=form&tab=offices&id=7b0dbe32c986ec9f5badb1adb0c151d6.

> • "When in such capacity, he could or would assist, support or further the entity or organization in competition with [Herren]."

The non-solicitation provision (*id.* at 1-2) prohibits, also for the period of employment plus one year, the employee from

> • "(i) solicit[ing] or attempt[ing] to secure, either directly or indirectly, [Herren's] clients or customers . . . which shall include [the following:]"
>
> > o "individuals, business entities and government agencies for whom the Employee rendered consulting services during his employment with [Herren]"; or
> >
> > o "clients whom the Employee, either directly or indirectly, individually or together with other [Herren] employees, actively solicited within one (1) year of termination contract employment [sic]; or"
>
> • "(ii) hir[ing] or solicit[ing] for employment any employee of [Herren] or former employee of [Herren] who left within six (6) months."

Herron alleges that Britton has not only breached both of these provisions by becoming a subcontractor to Maga Design, but has also committed the following wrongful acts:

> • breached her fiduciary duty by usurping a corporate opportunity belonging to Herren (Count III);
>
> • tortiously interfered with Herren's "ongoing business relationship and expectancy with its client, the Navy" (Count IV); and
>
> • conspired with "another person" – not identified – "to ensure that the Navy engaged Britton, through her own company, Mission Effect, LLC, to provide certain services that rightfully ought to have been provided by Herren . . . ." (Count V).

## STANDARD OF REVIEW

A court considering a motion to dismiss under Rule 12(b)(6) is to assume that the well-pleaded allegations in the complaint are true and to draw all reasonable inferences in the plaintiff's favor. *Burbach Broad. Co. v. Elkins Radio Corp.*, 278 F.3d 401, 406 (4th Cir. 2002).

"However, that requirement applies only to facts, not legal conclusions." *United States Golf Learning Inst., LLC v. Club Mgrs. Ass'n*, 2011 WL 5599379, at *3 (E.D. Va. 2011) (Brinkema, J.) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).   Moreover, Rule 8 demands that a plaintiff provide more than mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)) (internal quotation marks omitted).   A complaint containing facts that are merely consistent with a defendant's liability falls short of the line between possibility and plausibility of entitlement to relief. *Twombly*, 550 U.S. at 557.   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.   Ultimately, "[d]etermining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## ARGUMENT

### I.   THE RETENTION AGREEMENT'S NON-COMPETITION AND NON-SOLICI-TATION PROVISIONS ARE OVERBROAD AND THUS UNENFORCEABLE AS A MATTER OF LAW.

As discussed above, Herren's Retention Agreement[11] contains provisions limiting post-employment competition and solicitation of Herren customers and employees.   The agreement is overbroad and unenforceable under black-letter principles of Virginia law that govern such agreements.   The analytical framework to be applied to the non-competition provision and the non-solicitation provision are identical. *Brainware, Inc. v. Mahan*, 808 F. Supp. 2d 820, 825

---

[11]   Although Herren did not attach the Retention Agreement to the complaint, Herren relies on it as the basis for Counts I and II.   As a result, the Court may consider the agreement itself (Ex. 11) on a motion to dismiss. *CACI Int'l*, 566 F.3d at 154.   The Retention Agreement contains a Virginia choice-of-law provision. Ex. 11 at 2.

(E.D. Va. 2011) (Brinkema, J.).

Whether a restrictive covenant may be enforced is a matter of law. *Omniplex World Servs. Corp.*, 618 S.E.2d 340, 342 (Va. 2005). Such covenants are disfavored as restraints on trade. As a result, the employer bears the burden of proof, and ambiguity in the contract is strictly construed against the employer and in favor of the employee. *Id.*; *Simmons v. Miller*, 544 S.E.2d 666, 678 (Va. 2011). The employer's burden is to show that the "provision is [1] no greater than necessary to protect the employer's legitimate interests, [2] is not unduly burdensome on the employee's ability to earn a living, and [3] does not offend sound public policy." *Brainware*, 808 F. Supp. 2d at 825 (collecting cases). These three factors are interrelated, and their analysis "requires consideration of the restriction in terms of function, geographic scope, and duration." *Simmons*, 544 S.E.2d at 677.[12]

When the facts alleged by Herren – assumed to be true for purposes of this motion only – are evaluated in light of the legal standard above, it is plain that both the non-competition and non-solicitation provisions are unreasonable and unenforceable.

---

[12] It should also be noted that there is a threshold issue relating to Britton's signing of the Retention Agreement in the middle of her employment. This Court held in 2002 that, in the absence of precedent, the Virginia Supreme Court would follow the rule that continued employment is not sufficient consideration for a restrictive covenant executed in the middle of the employment period. *Mona Elec. Group, Inc. v. Truland Service Corp.*, 193 F. Supp. 2d 874, 876 (E.D. Va. 2002). Four years later, another decision of this Court pointed out that the Virginia Supreme Court had ruled on the issue prior to the 2002 decision and had held that continued employment did constitute sufficient consideration. *See Phoenix Ren. Corp. v. Rodriguez*, 461 F. Supp. 2d 411, 424-25 (E.D. Va. 2006), *discussing Paramount Termite Control Co. v. Rector*, 380 S.E.2d 922, 926 (Va. 1989). The Virginia Supreme Court recently overruled much of *Paramount* – but not the consideration ruling, which was not before the court – in *Home Paramount Pest Control Cos. v. Shaffer*, 718 S.E.2d 762, 763-66 (Va. 2011). Even if *Paramount* is still good law, it should not apply here, where Britton signed the Retention Agreement six years into her employment and was terminated seven months later.

### A. Non-Competition Provision (Count II)

#### 1. Legitimate Business Interests

Herren's non-competition provision is absolute:  the departed employee may not work for "**any**" competitor of Herren's Federal Sector practice "in **any** capacity, job or function" if the employee's new employer "provides management consulting services" similar to those provided by Herren during the time the employee was with Herren. Ex. 11 at 2 (emphasis added).  The agreement does not condition the restriction on the nature of the work that the employee performed for Herren or the nature of the work being performed for the new employer.

This failure to link the type of services rendered by the employee for Herren with the post-employment restriction renders the non-competition provision unenforceable.  "Virginia courts have appropriately and consistently prohibited such overly-broad non-compete clauses." *Lanmark Tech., Inc. v. Canales*, 454 F. Supp. 2d 524, 530 & n.12 (E.D. Va. 2006) (collecting cases). "[W]here . . . the non-compete clause effectively prohibits the employee from working in virtually any capacity for a competitor, it is not narrowly drawn to protect the employer's legitimate business interest, and, thus, is functionally overbroad." *Id.* at 530.  Similarly, this Court held in *Cantol, Inc. v. McDaniel*, 2006 WL 1213992 (E.D. Va. 2006), that "the Virginia Supreme Court upholds covenants not to compete [that] restrict the former employee's performance of functions for his new employer **only** to the extent that the proscribed functions are the **same** functions as were performed for the former employer." *Id.* at *4 (emphasis added) (collecting Virginia authorities).[13]

---

[13]   The common example used by Virginia courts that strike down such restrictions is that the non-compete in issue would preclude the departed employee from working as a janitor for the new employer. *E.g.*, *Roto-Die Co. v. Lesser*, 899 F. Supp. 1515, 1520 (W.D. Va. 1995); (restriction "void on its face"); *Strategic Enter. Solutions, Inc. v. Ikuma*, 2008 WL 8201356, at *3 (Va. Cir. Ct. 2008) (provision "overly broad" and "unenforceable as a matter of law");
*(footnote continued)*

Thus, even if it is assumed that Britton has gone to work for a "competitor" of Herren – including Mission Effect, which is alleged to be a competitor[14] – and she performs any type of services for her new employer, including services wholly unrelated to the work she did for Herren, that conduct is proscribed by Herren's non-compete.   Moreover, as noted, above, Herren's definition of "competitor" is exceedingly broad: any entity that performs the same type of work that Herren performed while Britton was employed there, whether she engaged in that type of work or not.   The overbreadth of this restriction is exacerbated by the lack of any geographical limitation.   This Court has recognized that the absence of such a limitation is largely irrelevant where the employer seeking to enforce the covenant and the new employer each possess a "global reach." *Brainware*, 808 F. Supp. 2d at 827.   But here, Herren has alleged the opposite:   Herren "is a small business . . . that provides engineering and management consulting services to government clients throughout the Washington, D.C. metropolitan area." Compl. ¶ 1. *See also* Ex. 11 at 1.   Despite Herren's limited geographic reach, the noncompete purports to enforce Herren's restrictions globally.   Herren can demonstrate no legitimate business interest that requires a worldwide restriction.[15]

Finally, Herren is not saved by the sentence fragment that ends the non-competition provision:   "When in such capacity, he could or would **assist**, support or further the entity or organization in competition with [Herren]." Ex. 11 at 2 (emphasis added).   This Court analyzed similar language in *Lanmark*: ". . . [T]he non-compete clause is even more far-reaching because it prohibits [defendant] from **assisting** [his new employer] in winning" a contract for services

---

*Cliff Simmons Roofing, Inc. v. Cash*, 1999 WL 370247, at *1-2 (Va. Cir. Ct. 1999) ("invalid restriction on competition").

[14]   Compl. ¶¶ 16-17.

[15]   The duration of the restrictive covenants in the Retention Agreement is one year, a period generally held to be reasonable. *See, e.g.*, *Brainware*, 808 F. Supp. 2d at 828.

wholly unrelated to work performed at the plaintiff-former employer.  454 F. Supp. 2d at 530 (emphasis added).

As in *Lanmark*, the non-competition provision in Herren's Retention Agreement is, on its face, "breathtakingly and excessively broad." 454 F. Supp. 2d at 529.

### 2. Effect on Departed Employee's Ability to Earn a Living

For related reasons, the non-competition provision fails the second part of the enforceability test because it is "unduly harsh and oppressive in curtailing [the employee's] legitimate efforts to earn a livelihood." *Richardson v. Paxton Co.*, 127 S.E.2d 113, 117 (Va. 1962) (prohibition from engaging in "any branch" of marine equipment or services held unenforceable).  Here, the non-competition provision contains a number of broad, ambiguous terms (as discussed above), susceptible of a meaning that constitutes overbreadth.  Under such circumstances, the clause fails:

> To hold otherwise would amount to a "blue penciling" of the contract and would permit an "*in terrorem* effect on an employee, who must try to interpret the ambiguous provision to decide whether it is prudent, from a standpoint of possible legal liability, to accept a particular job or whether it might be necessary to resist plaintiff's efforts to assert that the provision covers a particular job."

*Lanmark*, 454 F. Supp. 2d at 529 (quoting *Power Distribution, Inc. v. Emergency Power Eng'ring, Inc.*, 569 F. Supp. 54, 58 (E.D. Va. 1983)).  There is, of course, no authority for Virginia courts to "blue pencil or otherwise rewrite the contract to eliminate any illegal overbreadth." *Brainware*, 808 F. Supp. 2d at 829 n.2 (quoting *Lanmark*, 454 F. Supp. 2d at 529).

The lack of a geographic restriction in the noncompete also works an obvious hardship on the employee, who is prevented from obtaining work anywhere in the world, even though Herren's business is limited to the D.C. metropolitan area.

13

### 3.   Public Policy

As a threshold matter, "subjecting an employee to [the] uncertainty [of an ambiguous non-compete clause] offends sound public policy and thus runs afoul of the third part of the enforceability test." *Lanmark*, 454 F. Supp. 2d at 531. *See also Power Distribution*, 569 F. Supp. at 57-58 (same).

"There is [also] a strong public policy that favors competition in the award of government contracts." *Pan Am World Servs., Inc. v. United States*, 1988 WL 25480, at *1 (D.D.C. 1988). Indeed, the FAR's "statement of guiding principles" includes pledges that the Federal Acquisition System will "[p]romot[e] competition" and "us[e] contractors who have a track record of successful past performance or who demonstrate a current superior ability to perform." 48 C.F.R. § 1.102(b)(ii), (iii). Similarly, the Competition in Contracting Act, 41 U.S.C. § 3301 *et seq.*, states that an agency engaged in procurement must

> (1) obtain full and open competition through the use of competitive procedures in accordance with [the Act] and the [FAR]; and
>
> (2) use the competitive procedure or combination of competitive procedures that is best suited under the circumstances of the procurement.

*Id.* § 3301(a).

Herren's overbroad non-competition provision is at war with this important public policy. Herren's attempt to limit competition by departing employees offends not only Virginia common law, but also the federal government's interest in fostering competition among contractors in order to obtain "the best value product or service to the [federal] customer, while maintaining the public's trust and fulfilling public policy objectives." 48 C.F.R. § 1.102(a).

### B.   Non-Solicitation Provision (Count I)

The same legal framework applies in the analysis of a non-solicitation provision as it

14

does for a non-competition provision. *Brainware*, 808 F. Supp. 2d at 825.  As a result, the same infirmities identified and analyzed for the non-competition provision apply with equal force to the non-solicitation provision.

Like the non-compete, the non-solicit is impermissibly broad and ambiguous:  a former employee may not solicit, directly or indirectly, Herren's "clients or customers," a phrase that includes (a) "individuals, business entities and government agencies for whom the Employee rendered consulting services" while employed by Herren; and (b) "clients" whom the employee, "either directly or indirectly, individually or together with other [Herren] employees, actively solicited within one (1) year of termination contract employment [sic]." Ex. 11 at 1-2.

The second category of "clients" who are not to be solicited is, as written, incomprehensible.  It is impossible to discern what Herren is trying to say in its form agreement. Given that restrictive covenants are to be strictly construed against the employer,[16] Herren's attempt to restrict solicitation of this second category of "clients" must fail.

It is the other category of "clients or customers," however, that appears to be more at issue here:  "individuals, business entities and government agencies for whom Employee rendered consulting services" while employed by Herren.  Although the "clients or customers" are limited to those serviced by Britton while at Herren, it is plain that the provision is overbroad because of Herren's interpretation of it.

At the bottom of this lawsuit is Herren's assertion that the United States Navy is a **single** client or customer:

- Herren has an ongoing business relationship and expectancy with its client, the Navy." Compl. ¶ 51.

- "Britton was aware of the ongoing business relationship

---

[16]    *Simmons*, 544 S.E.2d at 678.

between the Navy and Herren . . . ." *Id.* ¶ 52.

- Britton "solicit[ed] the Navy to use her and . . . Mission Effect LLC . . . ." *Id.* ¶ 53.

- "As a proximate result of Britton's intentional interference, Herren's business relationship and expectancy with the Navy has been disrupted and lost value." *Id.* ¶ 54.

- "Britton agreed with and acted in concert with another person to ensure that the Navy engaged Britton, through . . . Mission Effect, LLC . . . ." *Id.* ¶ 60.

But, as discussed above, the Navy, with regard to government contracts, is anything but monolithic:

- There are 11 Navy "contracting activities," including the five Systems Commands.[17]

- Within each contracting activity, the Head of the Contracting Activity delegates his or her contracting authority, and it is re-delegated down to the "contracting officer" level.[18] Contracting officers are the only persons who may enter into contracts on behalf of the federal government.[19]

- During FY 2012-2013, there were at least 444 distinct contracting entities within the Navy.[20]

- In FY 2010, the Navy's contracts totaled nearly $90 billion.[21]

So it makes no sense for Herren to refer to "the Navy" as its client, a fact that Herren realizes, but attempts to gloss over. Herren alleges the following:

> NAVSUP Mechanicsburg is a client or customer of Herren. Herren has provided services to NAVSUP Mechanicsburg through its Navy ERP contract. For example, in Spring 2013, Herren was

---

[17]   48 C.F.R. § 202.101.

[18]   *Id.* §§ 1.102-4(b); 1.108(b); 2.101.

[19]   *Id.* § 1.601(a).

[20]   *See* Ex. 6 & n.7 *supra.*

[21]   *See* Ex. 7 at 21.

> providing transition services to NAVSUP Mechanicsburg through the transition services it was performing in the Navy ERP Program Management Office in Annapolis.

Compl. ¶ 12.

Herren's conclusory statement that "NAVSUP Mechanicsburg" is its "customer or client" is directly contradicted by facts of which the Court may take judicial notice. Although Herren neglects to allege it, its contract to provide services to Navy ERP (Enterprise Resource Program) was awarded by Space and Naval Warfare Systems Command ("SPAWAR"). *See* Ex. 1. That is an entirely different Command, with a wholly separate reporting structure, from Naval Supply System Command ("NAVSUP") which is headquartered in Mechanicsburg, Pennsylvania.

Despite Herren's attempt to indicate otherwise, NAVSUP has never awarded Herren a contract; nor does Herren allege that such a contract was awarded to it. Rather, an entity within NAVSUP – Weapons Systems Support ("NAVSUP WSS") – awarded a contract to Maga Design, not Herren. *See* Exs. 8 and 9. And, as Herren does allege, it was Maga Design – **not** NAVSUP WSS – that subcontracted part of Maga Design's work to Britton's company. Compl. ¶ 21. The fact that Maga Design is also a subcontractor to Herren on Herren's Navy ERP contract, Compl. ¶ 19, does not convert Maga Design's contract with NAVSUP WSS into a Herren contract. Nor does it convert Maga Design into a Herren "client," as Herren alleges. *Id.* ¶ 23.

Once the parties and their respective roles are sorted out – using only the complaint and materials that may be judicially-noticed – it is plain that there was no "solicitation" by Britton of any Herren "client or customer." This exercise is precisely the sort of "context-specific task that requires the reviewing court to draw on its judicial experience and common sense," as mandated by the Supreme Court. *Iqbal*, 556 U.S. at 679.

## II.  HERREN HAS FAILED TO ALLEGE A CLAIM FOR TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP OR EXPECTANCY.

To establish tortious interference with a business relationship or expectancy, a plaintiff must show "(1) the existence of a business relationship or expectancy, with a probability of future economic benefit to plaintiff; (2) defendant's knowledge of the relationship or expectancy; (3) a reasonable certainty that absent defendant's intentional misconduct, plaintiff would have continued in the relationship or realized the expectancy; and (4) damage to plaintiff." *Taylor v. CNA Corp.*, 782 F. Supp. 2d 182, 204 (E.D. Va. 2010) (citations omitted). "The first and third elements of this tort require objective proof, not the mere hope or possibility of future benefit." *Id.*

The most obvious problem with Herren's tortious interference claim is the same flaw present in the solicitation claim: both rely on the Court's acceptance of Herren's baseless assertion that the Navy is one customer.  In Count IV, Herren alleges:

- "Herren has an ongoing business relationship and expectancy with its client, the Navy." Compl. ¶ 51.

- "Britton was aware of the ongoing business relationship between the Navy and Herren . . . . *Id.* ¶ 52.

- ". . . Britton intentionally interfered with this relationship by . . . [*inter alia*] soliciting the Navy to use her, and her newly formed company . . . ." *Id.* ¶ 53.

First, even accepting Herren's version of Britton's actions as true, the fact remains that (1) Herren's contract to work on Navy ERP is with SPAWAR; (2) Maga Design's contract is with NAVSUP WSS; and (3) Britton's work is as a subcontractor to Maga Design on its contract with NAVSUP WSS.  The lack of a common identity between the two Navy contracting parties – indeed, they are within different Commands – dooms Herren's claim, which is based solely on the bizarre notion that the Navy is one client.

18

Second, even if the Court were to accept the "fact" that the Navy is one client, the claim still fails. Nothing Britton is alleged to have done affected Herren's existing contract with the Navy, which is paying Herren $3.3 million between April 2013 and January 2014. *See* Ex. 1.

The "business expectancy" piece of the claim fares no better. Herren has alleged no facts that even hint of the "objective proof" required for the first and third elements of the tort: the "probability of future economic benefit" and "the reasonable certainty that absent [Britton's] intentional misconduct, [Herren] would have . . . realized the expectancy." *Taylor*, 782 F. Supp. 2d at 204. The Court may take judicial notice of the fact that the Navy's contracts, like all government contracts, are competitively bid absent an exception. *See, e.g.*, the Competition in Contracting Act, 41 U.S.C. § 3301 *et seq.* Herren has alleged no facts – nor will it ever be able to prove – that it would have obtained a particular Navy contract absent Britton's conduct. Because Herren cannot even allege an expectancy "based on something that is a concrete move in that direction," the claim must be dismissed. *Government Employees Ins. Co. ("GEICO") v. Google, Inc.*, 330 F. Supp. 2d 700, 705 (E.D. Va. 2004) (Brinkema, J.) (citation and internal quotation marks omitted) (dismissing tortious interference claim).

That Maga Design made Britton's company its subcontractor on the NAVSUP WSS contract does not save Herren's claim. Herren alleges that Britton tortiously interfered with its relationship with the Navy, **not** with its relationship with Maga Design. Compl. ¶¶ 51-57. Maga Design was free to make Herren its subcontractor instead of Britton, but it chose not to do so.

## III. HERREN HAS FAILED TO ALLEGE A CLAIM UNDER THE VIRGINIA BUSINESS CONSPIRACY ACT.

To state a claim under the Virginia Business Conspiracy Act, Va. Code §§ 18.2-499 to -500, a plaintiff must allege "(1) concerted action; (2) legal malice; and (3) causally related injury." *Cruey v. Huff*, 2010 WL 1539995, at *4 (W.D. Va. 2010). But in order to survive a

19

motion to dismiss, "business conspiracy, like fraud, must be pleaded with particularity, and with more than 'mere conclusory language.'" *GEICO*, 330 F. Supp. 2d at 706 (citation omitted) (dismissing Virginia Business Conspiracy Act claim). "The heightened pleading standard prevents every business dispute over unfair competition becoming a business conspiracy claim." *Id.* *Accord Field v. GMAC LLC*, 660 F. Supp. 2d 679, 689 (E.D. Va. 2008) (dismissing Virginia Business Conspiracy Act claim); *Harper Hardware Co. v. Powers Fasteners, Inc.*, 2006 WL 141672, at *5 (E.D. Va. 2006) (same).

As a threshold matter, Herren, in Count V, has failed to identify Britton's purported co-conspirator, not even as a John Doe. Similarly, the complaint contains no allegations beyond conclusory statements as to the method of the conspiracy or how its goals were achieved. Nor has Herren specified the nature or amount of damages it allegedly suffered. The lack of these foundational allegations requires dismissal of the business conspiracy claim, particularly in light of the heightened pleading standard. *Field*, 660 F. Supp. 2d at 689; *Harper Hardware*, 2006 WL 141672, at *5; *GEICO*, 330 F. Supp. 2d at 706.

## CONCLUSION

For all the foregoing reasons, the Court should (1) dismiss Counts I and II with prejudice and declare Herren's Retention Agreement unenforceable in its entirety; and (2) dismiss Counts IV and V with prejudice for failure to state a claim.

Respectfully submitted,


_____/s/_____
Charles B. Wayne (VSB # 24954)
Victoria A. Bruno (*pro hac vice*)
DLA Piper LLP (US)
500 8th Street, N.W.
Washington, D.C. 20004
(202) 799-4253
(202) 799-5253 (fax)
charles.wayne@dlapiper.com
victoria.bruno@dlapiper.com

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of November, 2013, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send notification of such filing (NEF) to the following:

> Susanne Harris Carnell
> Michael J. Lorenger
> Lorenger & Carnell PLC
> 651 South Washington Street
> Alexandria, VA 22314

> _/s/_____
> Charles B. Wayne (VSB # 24954)
> DLA Piper LLP (US)
> 500 8th Street, N.W.
> Washington, D.C. 20004
> (202) 799-4253
> (202) 799-5253 (fax)
> charles.wayne@dlapiper.com