1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
J. L. HERREN & ASSOCIATES, P.C., .   Civil Action No. 1:13cv1314
                                  .
                 Plaintiff,       .
                                  .
      vs.                         .   Alexandria, Virginia
                                  .   December 13, 2013
MELISSA BRITTON,                  .   10:00 a.m.
                                  .
                 Defendant.       .
                                  .
. . . . . . . . . . . . . . . .
```

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:              SUSANNE HARRIS CARNELL, ESQ.
                                Lorenger & Carnell PLC
                                651 South Washington Street
                                Alexandria, VA 22314


FOR THE DEFENDANT:              CHARLES B. WAYNE, ESQ.
                                VICTORIA A. BRUNO, ESQ.
                                DLA Piper US LLP
                                500 Eighth Street, N.W.
                                Washington, D.C. 20004


ALSO PRESENT:                   MELISSA BRITTON
                                JEFF VOTH


OFFICIAL COURT REPORTER:        ANNELIESE J. THOMSON, RDR, CRR
                                U.S. District Court, Fifth Floor
                                401 Courthouse Square
                                Alexandria, VA 22314
                                (703)299-8595


(Pages 1 - 21)


COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2

```
 1                      P R O C E E D I N G S
 2              THE CLERK:  Civil Action 13-1314, J. L. Herren &
 3     Associates, P.C. v. Melissa Britton.  Would counsel please note
 4     their appearances for the record.
 5              MS. CARNELL:  Good morning, Your Honor.  Susanne
 6     Carnell from Lorenger & Carnell, here on behalf of
 7     J. R. Herren & Associates.  I have with me Jeff Voth, president
 8     of my client.
 9              THE COURT:  All right.
10              MR. WAYNE:  Good morning, Your Honor.  Charles Wayne,
11     and I'm here with my colleague, Victoria Bruno, and our client,
12     defendant Melissa Britton.
13              THE COURT:  All right.  Well, this matter comes on
14     with the plaintiff's motion for preliminary injunction.
15     Mr. Wayne, let me ask you this:  Your client, how many people
16     are involved in her business?
17              MR. WAYNE:  I believe it's her and her alone.
18              THE COURT:  She alone.
19              MR. WAYNE:  Correct.
20              THE COURT:  All right.  And how many contracts does
21     your client currently have?  Just the one that's at issue?
22              MR. WAYNE:  The one subcontract through Maga, through
23     Maga Design.
24              THE COURT:  All right.  And roughly how big a
25     contract is that?  In other words, what's the length of time
```

3

1    that that's supposed to run, do you know?

2           MR. WAYNE:  It's on a month-to-month basis, but the

3    total duration is at this point unknown.

4           THE COURT:  But it's a month-to-month basis.

5           MR. WAYNE:  It's on a month-to-month basis.  The

6    project that is being worked on over the large project is this

7    implementation of a, of an IT system for the Navy that would

8    replace all of the legacy systems, so it's going to go far into

9    the future.

10          I would note that she is limited under the

11   subcontract to 32 hours per week; so technically, it's only

12   part time; and that is her only source of employment -- source

13   of income.

14          THE COURT:  All right.  And Maga Design, how big a

15   company is that?

16          MR. WAYNE:  In terms of employees?

17          THE COURT:  Yeah, just ballpark figure.

18          MR. WAYNE:  Twenty to 25, Your Honor.

19          THE COURT:  And it's Maga who issued the subcontract

20   to your client?

21          MR. WAYNE:  That is correct.  Maga has the prime

22   contract with NAVSUP, the Naval Supply Command.

23          THE COURT:  All right.  Now, does Maga also have a

24   contractual relationship of any kind with the plaintiff?

25          MR. WAYNE:  No.

4

1            THE COURT:  All right.  Now --

2            MR. WAYNE:  Well, I'm sorry, oh, yes, Maga is the

3    subcontractor to Herren.

4            THE COURT:  To Herren.

5            MR. WAYNE:  On a totally different matter, through a

6    different, as we state in our brief, through a different Navy

7    Command.

8            THE COURT:  All right.  All right, now I'll ask the

9    plaintiff, Ms. Carnell, are you going to be the spokesperson

10   for the plaintiff?

11           MS. CARNELL:  Yes, Your Honor.

12           THE COURT:  All right, then please be at the lectern.

13           MS. CARNELL:  Yes.

14           THE COURT:  One of the arguments that defense is

15   making is that the particular work which the defendant is doing

16   is not work which the plaintiff would have gotten or could have

17   gotten, wasn't equipped to get.  What do you say in response to

18   that?

19           MS. CARNELL:  We disagree, Your Honor.  This is work

20   that Ms. Britton discussed with Mr. Voth seeking -- let me, if

21   I could just step back for a moment, and I think the question

22   you just posed to the defendant might help me answer that.

23   This is how my layperson would describe it:  Navy ERP is this

24   computer system.  Herren has, which is a somewhat larger

25   company, about 75 employees, has had a contract with an entity

5

1   called, well --

2          THE COURT:  Another entity.

3          MS. CARNELL:  It's the Navy ERP, and they have a

4   contract, a prime contract by which they assist the Program

5   Management Office in running its functions.  It's not the

6   technical side of the software program; it is the

7   administrative side.

8          Ms. Britton was the face of the client to that

9   office; and as part of her role, that office is wrapping up the

10   implementation.  That will continue over a course of years; and

11   they're moving it to the sustainment phase of this program; and

12   as they move it to the sustainment phase, they're actually

13   reducing the work at the Program Management Office for the

14   implementation, which is in Annapolis; and they're increasing

15   work, opening an office in Mechanicsburg that will have much of

16   the same function as the Program Management Office, that's

17   their intent as we understand it, in Mechanicsburg as it

18   transitions from implementation to sustainment.

19          Ms. Britton had a variety of tasks for us.  She

20   interfaced with the Program Management Office.  She was our

21   program manager for that important contract for our client; and

22   she assisted in facilitating discussions between the Program

23   Management Office, the Mechanicsburg NAVSUP BSC, and other Navy

24   entities that are, all have a stake in this transition from

25   implementation to sustainment.

6

1          She was facilitating those discussions.  Part of that

2     discussion was the transfer of knowledge and knowledge

3     management from the existing Program Management Office in

4     Annapolis that does this work, manages this system, to NAVSUP

5     BSC that is about to manage this system and is taking over a

6     program management role.

7          So what they identify as what she does is program --

8     is knowledge management, knowledge transfer.  I think the

9     documents that we've submitted to Your Honor demonstrate that

10    the knowledge that she's trying to transfer, the knowledge that

11    she's managing, and the reason that she was so valuable to Maga

12    and to the client is because of her incumbency with Herren,

13    because that she was the person working right in Annapolis, and

14    all of that is our knowledge.  All of those templates are our

15    templates.  All of that information is information she gained

16    solely and because of her relationship with the Annapolis

17    Program Management Office.

18         They might say that what she's doing is knowledge

19    management and knowledge transfer and that because we have not

20    transferred the Program Management Office from Annapolis to any

21    other office, we haven't had to do that before; but I think

22    it's disingenuous to suggest that this is a completely

23    unrelated project or that the tasks she's being asked to do are

24    completely unrelated.

25         THE COURT:  All right.

1            MS. CARNELL:  But my -- the significant point is

2    we're not actually trying to prevent her from -- we're not

3    asking you today, although I think it will be justified and we

4    will ask for it at some later point at a trial on the merits,

5    to require her to quit this job, but what we see and as

6    information keeps rolling out, as is the case in these matters,

7    we are learning that we believe that she and Maga have decided

8    that they want to be the Herren at Mechanicsburg and to cut

9    Herren out of the work.

10           Herren has been the incumbent with this contract for

11   three or four years; and they would have been perfectly

12   positioned to assist Mechanicsburg in developing this Program

13   Management Office; but they've decided that if they have

14   Ms. Britton, they won't need Herren, or at least that's what we

15   expect to be able to prove.

16           THE COURT:  But you've not named Maga as a

17   codefendant in this case.

18           MS. CARNELL:  We have not, Your Honor, and let me,

19   let me tell you why that is.  The plaintiff -- or at least not

20   yet, because I will tell you that Mr. Williams' declaration

21   submitted in this case changes the tenor of the relationship

22   between Maga and Herren very significantly; and they are

23   rethinking what had been a well-thought-out decision not to

24   name them.

25           Maga Design and Herren Associates have had a very

8

1   productive working relationship for several years.  Maga Design

2   is not only a subcontractor to Herren on the very contract

3   we're discussing, Herren's contract for Navy ERP Program

4   Management Office, they are a subcontractor to Herren on that

5   contract; and they have a non-solicitation provision that would

6   have prevented them from soliciting Ms. Britton to join them.

7   They also have a teaming agreement with Herren to go out and

8   try to develop joint work together.  So they have had a

9   productive working relationship.

10          Herren expected and had discussions with Ms. Britton

11   when it believed she was a loyal employee to develop this

12   relationship.  Maga has a prime contract with the Mechanicsburg

13   office.  Maga was going -- they expected and they had had

14   discussions with Ms. Britton about working with Maga in a

15   teaming relationship to exploit the fact that Herren had this

16   incumbency, knew how to run the Program Management Office, and

17   all working together, they would have developed this work at

18   Mechanicsburg; and at some point, we're still trying to figure

19   out exactly when, whose idea it was, and how this conspiracy

20   came together, but by May 17, they had entered into a

21   conspiracy essentially to cut Herren out and to take that

22   incumbent knowledge, those documents, the entire computer, and

23   to move it over to Ms. Britton and her new company.

24          THE COURT:  All right.  Well, there are two issues in

25   this case.  One issue, I think, is far more dramatic and better

9

1  established than the other, and that is this issue with the

2  laptop --

3          MS. CARNELL:  Yes.

4          THE COURT:  -- and so I want again to have the

5  defense address that issue.

6          I don't understand and I don't know who -- Mr. Wayne,

7  I don't understand why your client first of all took the

8  plaintiff's laptop in the first place, and secondly, these

9  descriptions about the way in which it's been encrypted such

10 that they are still unable to access, as I understand it from

11 the papers, all the information that was on that computer.

12         MR. WAYNE:  I believe that they are now able to

13 access all the information on the computer.  I could be

14 mistaken, but I believe that they are now, No. 1.

15         There is no good excuse for what Ms. Britton did,

16 which was -- although there is an explanation, which was to

17 upload the contents of the laptop to her storage space in the

18 cloud, where she did not access it and has not accessed it; but

19 there is no excuse for what she did; and in fact, when we

20 became her counsel, the very first thing that we did was to

21 secure that, make sure that she did not access it, asked --

22 totally cooperate with the other side; and I think although the

23 plaintiff has attached e-mails from myself and from Ms. Bruno

24 as exhibits to their reply brief, I think that those e-mails

25 show that we were trying to cooperate as best we could and

1    leaving it and being totally cooperative and trying to get them

2    the information back.  It was slightly complicated by, you

3    know, computer-related things that I won't go into; but once we

4    got involved, the intent was, was to get them their information

5    back.

6              THE COURT:  All right.  But as I understand it,

7    they've got the laptop, and you're saying that they have now

8    access to whatever was in the laptop.

9              MR. WAYNE:  That's my understanding.

10             THE COURT:  But what about the cloud storage?  I

11   mean, it's as if somebody went into a warehouse, took all of

12   the documents out of the warehouse, put them in a different

13   warehouse, has now made a copy of all that, given the copy back

14   or even given the originals back, but still has access to what

15   may not be information to which they have a right.

16             MR. WAYNE:  That is correct; and in part, okay, that

17   laptop was Ms. Britton's only laptop for a long period of time

18   while she was at Herren.  There were personal things on the

19   computer, I mean, on the laptop, not just family photos and

20   things like that, but also things related to a contentious

21   divorce proceeding that she was and is going through.  So there

22   was personal stuff; there was business stuff.

23             We have given them on -- we have given them on a disk

24   everything that we believe relates to Herren.  We intend to

25   give them through further searches and other things, we intend

1   to look more closely and give them everything that they're

2   entitled to.  We, you know, that is not, that is not our intent

3   to withhold anything.  They're entitled to have it back.  She

4   was not entitled to take it; we agree with that.

5           This can be explained and I would proffer that if she

6   were on the stand, she would say that she was fired on a

7   Tuesday, she had surgery on a Thursday, she was in bedrest on

8   heavy medication for two days, and it was the day after, the

9   Saturday, that she did this.  As I say, it's not an excuse; but

10  it's an explanation as to what's happened.

11          She knows now she shouldn't have done it.  She

12  didn't -- there's no spoliation of evidence issue here.  She

13  didn't destroy anything.  She simply made a copy of it, and

14  then she did put an encrypted password on the laptop.  I don't

15  know what the issue was with getting through that, but the

16  other side -- but Herren has done that now.  They've opened the

17  laptop.  They have accessed everything that's on the laptop.

18  We believe everything is there.

19          So again, that's not to minimize what she did back in

20  July; and that's not to make an excuse for what she did back in

21  July.

22          THE COURT:  Well, it sounds from the plaintiff's

23  papers that they are not satisfied that they can rely on those

24  representations and are still concerned about what it is that's

25  in the cloud.

1          MR. WAYNE:  We are still trying to -- if push comes

2    to shove and we are not able to segregate the purely personal,

3    you know, we are willing to give them access to everything if

4    it comes to that.  We don't think it will come to that.

5          THE COURT:  Well, one thought that I had in thinking

6    about this case was, I've done this before in other cases,

7    where there is computer information in a storage facility and

8    there are concerns, A, about is everything there, B, has it

9    been accessed and improperly further transferred, is for each

10   side to choose an expert, who would then choose a third expert,

11   so we have a truly neutral expert in the field of forensic

12   computer science who would then go and do the evaluation; and

13   both sides would then have a degree of confidence; and that

14   person could look at the issue, A, has there been any access to

15   this file, if there has been, what was done, what was

16   transferred out, and then B, to evaluate it with the parameters

17   that you would give him.

18          For example, I can't imagine that the defendant's

19   personal tax returns, because you mentioned tax returns, would

20   be of any value to the plaintiff.  That's purely private

21   information.  That could be, you know, taken out.  But anything

22   dealing with Herren, obviously, or possibly with negotiations

23   with Maga or with the Navy sufficiently relevant to the issues

24   in this case, to be turned over.

25          How does that sit as a way of resolving this issue?

13

1  Because otherwise, I can see you spending inordinate amounts of

2  time and money on discovery and disputes, and it would be

3  better to find a clean, reliable method for getting this

4  particular issue out of the case.

5          MR. WAYNE:  That's certainly acceptable to the

6  defendant.

7          THE COURT:  Let me hear from the plaintiff on that.

8  Ms. Carnell?

9          MS. CARNELL:  If I may, Your Honor, if I may

10  address -- I'll address this cloud storage, but I think there's

11  another issue about information that relates to the preliminary

12  injunction that we want to discuss.  With respect to the cloud

13  storage, obviously, I haven't had an opportunity to confer with

14  my client outside of the courtroom, but that approach seems

15  reasonable to me in terms of how to deal with evaluating what

16  is in that cloud and when it was accessed, getting a neutral

17  expert.  I appreciate that offer and that suggestion, and I

18  think we could agree with that.

19          THE COURT:  And you-all have to split the costs on

20  that, all right?

21          MS. CARNELL:  And I understand that, Your Honor; and

22  I anticipate that we could work that out.

23          And let me also say that I appreciate Mr. Wayne and

24  Ms. Bruno's attempts.  I don't impugn their integrity.  I think

25  they are and I certainly never meant to represent to the Court

14

1    that they have in any way deliberately obscured what is out

2    there.

3            What I think is happening with them as well as for us

4    is that we are learning every day more information; and as we

5    put in the reply brief yesterday, I think there is a

6    misunderstanding about what happened on the laptop.  There's a

7    couple of different issues.  The cloud storage, as you say, is

8    an issue that none of us can really adequately deal with unless

9    we have some expert.

10           The laptop issue -- and I understand they did provide

11   us with an external hard drive two days ago or three days ago

12   that has what they believe is nonpersonal; and we agreed that

13   they didn't have to give us the divorce information, for

14   example, on that external hard drive; and Ms. Bruno represented

15   that they would take that off, and that was fine, before

16   getting it back; but our concern in the preliminary injunction

17   is twofold:

18           What we know from her declaration and her admissions

19   is that she uploaded her entire laptop on the 20th, and her

20   declaration is very specific about that.  What we don't know is

21   what happened to that laptop and all of that information from

22   May to July, when we know that she's already planning to

23   compete.  She currently has a Mission Effect lament.  What did

24   she already transfer to the Mission Effect laptop between those

25   periods of time?  What did she print out?

1          THE COURT:  You're going to get that in discovery.

2          MS. CARNELL:  What's on a thumb drive?

3          THE COURT:  You'll get that in discovery.

4          MS. CARNELL:  Well, I'm afraid maybe we won't because

5   what we do know and that we learned in our reply brief -- and

6   shared with the Court in our reply brief is that she did not

7   return the laptop uninjured.  Not only did she install this

8   BIOS password -- and it's not just a simple password issue.

9   The only way to unlock that drive unless you knew the password,

10  which she gave us two and neither of them worked, was to get

11  Dell to issue a new password that would wipe the drive of all

12  of its information; and so no, we never took that step; and

13  that's what they've suggested we do.

14          We sent it to one forensic expert who thought he

15  could circumvent that password -- he could not -- to image the

16  drive and maintain the data.

17          THE COURT:  But you've done that now, haven't you?

18          MS. CARNELL:  Well, so we sent it again; and now what

19  he tells us is that the laptop was wiped, that the laptop

20  was -- before she returned it, someone went in on July 21, the

21  day after she uploaded it all to her own computer; and she

22  reinstalled the operating system on that Dell laptop; and so it

23  was cleared of its data.

24          Now, he is working as we speak to try to reproduce

25  what's there; but what we don't think we will ever know is we

1   will never get a forensic image of or at least my understanding

2   from the expert discussing it last night, as he is just

3   managing to pull this -- to get this, is that there is a lot of

4   information that we will never know from that laptop because

5   she overwrote, overwrote the operating system.  She attempted

6   to wipe the drive, and so she has already engaged in spoliation

7   of evidence.  She knew there was a likelihood of litigation.

8           And this is a pattern of conduct, that she took it

9   off -- I also -- the explanation that she had surgery doesn't,

10  doesn't hold, doesn't hold together.  So she goes into work on

11  Monday the 15th.  She thinks that she's going to work out an

12  arrangement with Herren where she can continue to work for us

13  part time.  We explored that opportunity.  We decided her

14  conduct was too disloyal to agree that she could continue to be

15  the face of us to the client, and we let her know on Tuesday

16  that we were letting her go, and they did continue to talk

17  about working out an arrangement at least on that Tuesday the

18  16th, and it didn't work, and Maga Design wanted them to work

19  something out.

20          So they knew she was going to be out for a couple of

21  days.  She had the obligation to return the laptop to them; but

22  she had documents on that laptop from the 16th and the 11th;

23  and to suggest that she uploaded it on the 20th and then just

24  walked away from it when she went into work on the 23rd, why on

25  the 20th would she upload information that she never intended

1    to use?

2            That just doesn't make any sense, particularly when

3    on the 21st, she ensured, took steps to ensure that Herren

4    would not only have that information itself, but that Herren

5    wouldn't be able to tell that she had uploaded it.

6            THE COURT:  All right.  Now, does the kind of work

7    that you-all do, does it require security clearances?

8            MR. VOTH:  It does, portions of the work.

9            MS. CARNELL:  Yes.

10           THE COURT:  And does -- to your knowledge, does

11   Ms. Britton have a security clearance?

12           MR. VOTH:  To my knowledge, she has.

13           MS. CARNELL:  Yeah, I think a Secret clearance.

14           Is that correct?  Yes.

15           THE COURT:  Just at the Secret level.

16           MS. CARNELL:  Yes.

17           THE COURT:  All right.  Well, look, here's what I'm

18   going to do in this case:  The request for preliminary

19   injunction is a request for extraordinary equitable relief; and

20   the standards have gotten much more difficult; and at this

21   point, I'm not satisfied because this to some degree is a he

22   said/she said situation at this point, I'm not satisfied that

23   the case is factually clear enough for the Court to make an

24   adequately informed decision as to the strengths and weaknesses

25   or likelihood of success of the plaintiff on any of the causes

1    of action; and of course, as you know, under the new standards

2    for evaluating preliminary injunction requests, that's a

3    significant issue the Court has to consider; and at this point,

4    I recognize that you're not asking the Court to enjoin the

5    defendant from continuing to work on her current project; but

6    I'm advised unless you have something to the counter that it's

7    not a full-time job.  It's 32 hours a week; and that isn't a

8    full-time position; and as you know, Virginia does not favor

9    restrictive covenants.

10          The argument the defense has made that the Navy is

11   not one employer but one must look more realistically at such a

12   humongous agency in a more refined manner, that to restrict the

13   defendant from being able to try to develop contracts with the

14   Navy is way too broad, and that means that the restrictive

15   covenant or the covenant not to compete may fail.

16          For that reason, I'm not going to grant your request

17   for preliminary injunction.  However, I am very concerned about

18   the potential spoliation of evidence or this issue with the

19   laptop and what would apparently be Herren's proprietary

20   information.  That is a significant issue, and it's a really

21   bad issue for the defense in this case.  Looking down the road

22   at the degree to which there may be jury appeal, that's going

23   to be a real hard problem; and so that has to be addressed

24   very, very promptly.

25          I think you should -- both sides should think

1  collectively about an order that you can submit to the Court

2  for my signature putting on restrictions and restraints on the

3  way in which any of the information that's in the cloud or that

4  has been transferred from the cloud to some other medium is

5  accessed by the defendant.  She does not have a right to use

6  the plaintiff's proprietary information; but again, I think

7  among the things that you-all have to do is again figure out a

8  mechanism, I've suggested one way of doing it, of getting some

9  expert in whom both sides have confidence and both sides agree

10  to live by how that expert sees the situation, to evaluate that

11  the cloud storage, the degree to which it's been accessed, and

12  to put both sides at ease that things are being done properly.

13          I asked about the security clearance issue because

14  the other thing that I want to stress to both sides, because I

15  could see the meters running very quickly in terms of discovery

16  and the transaction costs here, that when I have entities

17  before me who are dealing with the U.S. government and some of

18  your work is classified or requires clearances, you don't want

19  to be in a real ugly match in public court.  I think these

20  days, government contracting and contractors in general are

21  under scrutiny, especially those who have security clearances.

22  If there are breaches of ethics, I think that's a potential

23  problem for both sides.

24          And here we have Herren having had an ongoing

25  business relationship not just with this defendant but with

1    Maga.  Down the road, there's a potential problem there.

2              I think there ought to be a hard effort early on made

3    to try to resolve this dispute if you can amicably, rather than

4    going to war, which is really what litigation is all about.

5    You've got a very good magistrate judge, Judge Davis, assigned

6    to this case.  I think some of you have litigated here before.

7    You know that our magistrate judges are very experienced and

8    very adept at working things out; and I think, you know, both

9    sides ought to think about -- I know it's early in the ball

10   game; and obviously, there are hard feelings.  Putting that

11   aside, you're still both in the business of serving the U.S.

12   government; and you've got a third party out there, Maga; and

13   the smart thing would be, if you can do it, to get all three

14   entities together and try to work something out.  If you can't,

15   this case will go on.

16             So anyway, I'm denying the motion for the preliminary

17   injunction to the extent you're asking the Court to restrain

18   the defendant from trying to get work, all right?  She's got a

19   right to do that.  You can always if she does get another

20   contract that you could show you would otherwise have gotten,

21   damages down the road you can face; but the information on the

22   laptop is a real problem for the defense; and that's got to get

23   resolved; and so I am -- I will enter a restraining order to

24   that extent; but I want you, both sides, to try to work out the

25   language of that, all right?

21

1          That's my ruling.  Thank you.

2          MS. CARNELL:  Thank you, Your Honor.

3          MR. WAYNE:  Thank you, Your Honor.

4                    (Which were all the proceedings

5                     had at this time.)

6

7          CERTIFICATE OF THE REPORTER

8     I certify that the foregoing is a correct transcript of

9  the record of proceedings in the above-entitled matter.

10

11

12     _____
                        /s/
13                      Anneliese J. Thomson

14

15

16

17

18

19

20

21

22

23

24

25